## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Dale Edward Guthrie,**
**Petitioner Below, Petitioner**

**FILED**

June 6, 2014
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)   No. 13-1201** (Kanawha County 13-P-290)

**Marvin Plumley, Warden, Huttonsville Correctional Center,**
**Respondent Below, Respondent**

### MEMORANDUM DECISION

Petitioner Dale Edward Guthrie, appearing *pro se*, appeals the November 8, 2013, order of the Circuit Court of Kanawha County that denied his instant petition for a writ of habeas corpus. Respondent warden, by counsel Laura Young, filed a response. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 1994, petitioner was convicted of first degree murder in the death of Stephen Todd Farley. Petitioner was sentenced to life in prison with the possibility of parole. In *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court reversed petitioner's conviction and remanded the case for a new trial. Following his second trial, petitioner was again convicted of first degree murder and sentenced to life in prison with the possibility of parole.

In October of 1996, petitioner appealed his second conviction to this Court making the following assignments of error: (1) the circuit court erred in instructing the jury that gross provocation constituted an element of voluntary manslaughter; (2) the circuit court erred in instructing the jury that the gross provocation necessary for manslaughter was objective, and not subjective; and (3) the circuit court erred in refusing to give instructions taken verbatim from the body of this Court's opinion in *Guthrie*, which provided examples and factors for a jury to consider in determining first degree murder. This Court refused petitioner's appeal in January of 1997.

On November 15, 2007, petitioner filed his first petition for a writ of habeas corpus raising the following issues: (1) trial counsel was ineffective in not addressing whether there was sufficient evidence of first degree murder; (2) petitioner's constitutional rights were violated because he was not promptly presented to a magistrate following his arrest; and (3) insufficient evidence existed to support a conviction on first degree murder. The circuit court did not appoint habeas counsel for petitioner, but did require respondent warden to respond to the petition.

1

Following respondent warden's response, the circuit court denied the petition on September 19, 2008.

Petitioner filed the instant habeas petition on May 28, 2013, raising the following grounds for relief: (1) trial counsel was ineffective (a) by not arguing that the State did not promptly present petitioner to a magistrate, (b) by not moving to exclude testimony with regard to the occupation of the victim's father; and (c) by not appealing the circuit court's decision to allow an inflammatory line of questioning by the State; (2) the circuit court denied petitioner a fair trial by overemphasizing "gross provocation" at the expense of the element of malice in instructing the jury on voluntary manslaughter; and (3) the cumulative effect of these errors by counsel and the circuit court deprived petitioner of a fair trial. Once again, the circuit court did not appoint habeas counsel for petitioner, but required respondent warden to respond to the petition. Petitioner filed objections to the circuit court's refusal to appoint him counsel. Petitioner also filed a reply to respondent warden's response. On November 8, 2013, the circuit court denied the petition in a twenty-three page order.

Petitioner now appeals the circuit court's November 8, 2013, denial of his instant petition. We apply the following standard of review in habeas cases:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner asserts that he made factual allegations sufficient to entitle him to the appointment of counsel and an omnibus habeas corpus hearing. Petitioner argues that the circuit court acted unfairly in not appointing him counsel when the court ordered a response be filed by respondent warden's counsel. Petitioner argues that the circuit court also erred in ruling that the denial of petitioner's first petition in 2007 barred consideration of the instant petition under the doctrine of res judicata. Finally, petitioner asserts that the circuit court exhibited bias against him in making various rulings unfavorable to him.

Respondent warden counters that "[a] court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief." Syl. Pt. 1, *Perdue v. Coiner,* 156 W.Va. 467, 194 S.E.2d 657 (1973). Respondent warden further argues that the circuit court did not rely on the doctrine of res judicata,[1] but rather

---

[1] As petitioner correctly notes, the doctrine of *res judicata* bars subsequent habeas petitions only "where there has been an omnibus habeas corpus hearing at which the applicant for habeas corpus was represented by counsel or appeared pro se having knowingly and intelligently

reexamined the record and disposed of each of the issues in the 2013 petition with adequate findings. Last, respondent warden asserts that not only did petitioner not follow the proper procedure for moving for the circuit judge's recusal, but also that the only basis petitioner now alleges for seeking recusal is that the judge ruled against him.

This Court finds that the circuit court's order denying habeas relief adequately addresses the three issues raised in the instant petition. As to the issues petitioner raises solely on appeal, we reject those arguments as well. First, while petitioner complains of the circuit court's practice of requiring a response to the petition, that practice did not deprive the circuit court of its authority under *Perdue* to deny the petition without a hearing and without appointing counsel for petitioner. Second, the Court finds that, from a review of the circuit court's order and the appendix record, respondent warden is correct that the circuit court did not rely on the doctrine of *res judicata* in denying the instant petition. Third, the mere fact that the circuit court ruled against petitioner does not constitute a sufficient basis to question the circuit court's impartiality.

Having reviewed the circuit court's "Final Order Denying Amended Petition for Writ of Habeas Corpus," entered November 8, 2013, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error remaining in this appeal.[2] The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we find no error in the decision of the Circuit Court of Kanawha County and affirm its November 8, 2013, order, denying petitioner's instant petition for a writ of habeas corpus.

Affirmed.

---

waived his right to counsel." Syl. Pt. 2, in part, *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981).

[2] Petitioner contends that in denying relief on his prompt presentment claim, the circuit court should have addressed *State v. [George] Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984), which he alleges is analogous to his case. This Court finds that the circuit court did not need to address *[George] Guthrie* because that case is readily distinguishable from petitioner's. In petitioner's case, upon his arrest, petitioner was willing to give a statement to the police. In fact, the circuit court found that the 1995 trial transcript reflected that petitioner wanted to write out his statement himself because "he didn't want to leave anything out." *See also State v. [Dale] Guthrie*, 194 W.Va. 657, 665-66, 461 S.E.2d 163, 171-72 (1995) (petitioner made a statement at the police station and was described as "willing to cooperate."). The evil the prompt presentment rule seeks to prevent is a delay by the police in order "to *encourage* the suspect to make a statement," but "our prior cases do permit delay in bringing a suspect before a magistrate *when the suspect wishes to make a statement*." *State v. DeWeese*, 213 W.Va. 339, 345 n. 10, 582 S.E.2d 786, 792 n. 10 (2003) (Emphasis added.).

3

**ISSUED:** June 6, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

DALE EDWARD GUTHRIE

Petitioner,

v.

CASE NO. 13-P-290
Judge Paul Zakaib, Jr.

MARVIN C. PLUMLEY, WARDEN,
HUTTONSVILLE CORRECTIONAL CENTER,

Respondent.

## FINAL ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS

On a previous date, came Dale E. Guthrie, (Petitioner), pro se, and came the Respondent, by counsel, Jennifer D. Gordon, Senior Assistant Prosecuting Attorney in and for Kanawha County, West Virginia and filed a response to the Petition for Writ of Habeas Corpus previously filed by Petitioner. Petitioner also filed a Reply to the State's Response.

After reviewing the written arguments of Petitioner and counsel and after a thorough review of the Petition for Writ of Habeas Corpus and accompanying memorandum, the Respondent's Response, exhibits, and other documentary evidence and applicable case law as well as the Petitioner's Reply, the Court **FINDS** the matters ripe for decision and makes the following Findings of Fact and Conclusions of Law:

## I.     FINDINGS OF FACT

1.      Petitioner, Dale Edward Guthrie, was working with Stephen Todd Farley ("The victim" or "victim") at Danny's Rib House in Nitro, Kanawha County, West Virginia, during the evening hours of February 12, 1993. Also working with them that night was Tracy Farley, the

1

victim's brother, as well as James Gibson and Pam Wilson. (*See* Tr. Dec. 18-19, 1995 trial at pp. 211, 212, 258).

2.  The victim, along with his brother and Mr. Gibson, were all joking around that evening and trying to joke with Petitioner. While cleaning up in the kitchen, the Farley brothers and Mr. Gibson were light-heartedly teasing with each other. (*See* Tr. Dec. 18-19, 1995 trial at pp. 212-213).

3.  At some point, the victim good-naturedly flicked the Petitioner with a dish towel—once in each arm and once on the nose. (*See* Tr. Dec. 18-19, 1995 trial at pp. 212-213, 220-221, 226, 262). As he was doing so, the victim told the Petitioner "[c]ome on boy, lighten up." (*See* Tr. Dec. 18-19, 1995 trial at p. 228). Petitioner held onto the kitchen cart but said nothing. (*See* Tr. Dec. 18-19, 1995 trial at pp. 247-248).

4.  After Petitioner was flicked with the dish towel for the last time, Petitioner took off his vinyl dish washing gloves and walked toward the victim. The victim—still in a joking, good-natured mood—teased Petitioner saying "[o]oh, he's taking the gloves off now" as he backed up slightly. (*See* Tr. Dec. 18-19, 1995 trial at pp. 224, 226). Petitioner then reached into his right pocket, pulled out a pocket knife, and stabbed the victim in the neck. (*See* Tr. Dec. 18-19, 1995 trial at pp.224-228, 267).

5.  As the victim fell to the ground, he told Petitioner he "was just kidding around" upon which Petitioner replied "you should have never hit me in my face." (*See* Tr. Dec. 18-19, 1995 trial at pp. 274).

6.  The victim, Todd Farley, died as a result of the stab wound to his neck which had been inflicted upon him by the Petitioner. (*See* Tr. Dec. 18-19, 1995 trial at pp. 254).

2

P4

7. Pam Wilson, who was working as a waitress in the restaurant that night, testified at trial that the Petitioner actually tried to stab the victim again after he was down:

> Q. After Todd was stabbed, what happened to Todd?
>
> A. He fell against the smokers, and then when he did that, --
> he fell against the wall. And Dale come up on him again,
> so he'd get him this way, sideways. And Todd was already
> falling, and where he fell, half in and half out of the stockroom.
>
> Q. Would it be fair to say that he just missed?
>
> A. Him [Petitioner], stabbing him [the victim] again, yeah.

(*See* Tr. Dec. 18-19, 1995 trial at p. 267).

8. James Gibson also testified at trial that he saw "Todd laying on the ground and Dale was standing over top of him. And that's when I saw him standing there holding the knife. I saw the blade with some blood on it at the time." (*See* Tr. Dec. 18-19, 1995 trial at p. 228). Gibson further testified that Petitioner "said something to the effect of maybe now he won't harass him anymore. I don't remember exactly how it was worded, but the word 'harass' was definitely in there." (*See* Tr. Dec. 18-19, 1995 trial at p. 231).

9. Wilson asked Petitioner if he "was finished yet" (*See* Tr. Dec. 18-19, 1995 trial at p. 275). In response, the Petitioner, "cocked his blade half way. He didn't completely close it, but he did half way. And when he did that, at that time, I went and I held Todd in my arms. . . [and prayed] for him." (*See* Tr. Dec. 18-19, 1995 trial at p. 275).

10. Tracy Farley—upon seeing his brother attacked—ran out of the kitchen yelling, "[c]all 911, Dale stabbed my brother." (*See* Tr. Dec. 18-19, 1995 trial at p 146). Eric Sylvester, a cook at Danny's Rib House, ran to the kitchen door to see what happened. (*See* Tr. Dec. 18-19, 1995 trial at pp.145-146). He testified that he saw Todd in the kitchen and the Petitioner "just standing there." (*See* Tr. Dec. 18-19, 1995 trial at p. 146).

3

11.     Nitro Police Detective Jack Jordon was the first officer to respond on scene to Danny's Rib House to investigate the stabbing. (*See* Tr. Dec. 18-19, 1995 trial at p. 171). In the kitchen, Detective Jordan observed the victim lying on the floor with Pam Wilson. He observed a stab wound to his "lower neck/upper torso area." (*See* Tr. Dec. 18-19, 1995 trial at p. 172). Detective Jordan could feel the victim's pulse but it was "real light." (*See* Tr. Dec. 18-19, 1995 trial at p. 177).

12.     Detective Jordan was told that Petitioner had stabbed the victim. (*See* Tr. Dec. 18-19, 1995 trial at p. 178). The employees advised Detective Jordan that Petitioner had fled to the banquet room of the restaurant. (*See* Tr. Dec. 18-19, 1995 trial at p. 178). At trial, Detective Jordan testified regarding his initial encounter with Petitioner on that night:

> Q.     What did you do at the time?
>
> A.     I went inside the room. I called out 'Dale Guthrie' with no response. I then checked what appeared to be a bathroom. I looked in there. I didn't see anyone in there and started coming back out of the bathroom.
>
> Q.     As you came out of the bathroom, what happened?
>
> A.     I observed Dale Guthrie walking towards me.
>
> Q.     How did he come to your attention?
>
> A.     One of the walls is covered in mirrors, and I had caught a glimpse of some movement from the mirror. I immediately turned around and observed Dale Guthrie walking towards me.
>
> Q.     What happened then?
>
> A.     I immediately pointed a gun at Mr. Guthrie.
>
> Q.     Why is that?
>
> A.     For my protection and his protection, also.

4

Q. What did Mr. Guthrie do to cause you to pull your gun?

A. Well, he had just stabbed someone.

Q. Did Mr. Guthrie make any movements as you saw him?

A. Yes. Immediately as I turned around, Mr. Guthrie stuck his right hand in his right pocket.

(*See* Tr. Dec. 18-19, 1995 trial at pp. 178-179). Inside that right hand front pocket, Detective Jordan located a large lock-blade knife when he performed a pat down on the Petitioner. (*See* Tr. Dec. 18-19, 1995 trial at pp. 181-182). Petitioner was arrested and advised his *Miranda* warnings. (*See* Tr. Dec. 18-19, 1995 trial at pp. 184-185). At trial, Detective Jordan testified that Petitioner nodded yes when asked if he understood his rights. (*See* Tr. Dec. 18-19, 1995 trial at pp. 184-185).

13. Detective Jordan testified at trial regarding Petitioner's demeanor upon and after his arrest. According to Jordan, Petitioner "appeared to be very calm" when he first encountered him. (*See* Tr. Dec. 18-19, 1995 trial at p. 185). This calm continued throughout his arrest and throughout the evening. (*See* Tr. Dec. 18-19, 1995 trial at p. 197). Specifically, Detective Jordan testified that Petitioner "appeared very, very calm" throughout it all. (*See* Tr. Dec. 18-19, 1995 trial at p. 197).

14. Petitioner was transported to the Nitro Police Department, upon which he was again read his *Miranda* rights by Officer Stephen Pete. (*See* Tr. Dec. 20, 1995 trial at pp. 45-50). Officer Pete began reviewing the *Miranda* rights form with Petitioner at 10:50 p.m. and concluded the review at 10:53 p.m. (*See* Tr. Dec. 20, 1995 trial at pp. 47, 50). The original *Miranda* rights form was introduced into evidence at trial as State of West Virginia's Exhibit Five. It was signed by Petitioner and provided:

I have had this statement of my rights read to me, and I understand

5

what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.

(*See* Tr. Dec. 20, 1995 trial at pp. 48-49, 50; *see also* State's Exhibit Five).

15. While giving Petitioner his *Miranda* rights, Officer Pete noticed that the Petitioner was bleeding from his arm. (*See* Tr. Dec. 20, 1995 trial at pp. 52, 61). He also called paramedics who came to the police station and field dressed Petitioner's arm. (*See* Tr. Dec. 20, 1995 trial at pp. 52-53). Petitioner was given the opportunity to be treated at the hospital but instead signed a refusal to transport. (*See* Tr. Dec. 20, 1995 trial at p. 53). As to Petitioner's demeanor, Officer Pete testified that he "appeared calm [and] collected during their entire encounter. (*See* Tr. Dec. 20, 1995 trial at p. 51).

16. Detective Jordan asked Officer Mike Chatterton to obtain a statement from Petitioner. (*See* Tr. Dec. 20, 1995 trial at p. 65). Officer Chatterton again reviewed the *Miranda* form that was signed by Petitioner. (*See* Tr. Dec. 20, 1995 trial at p. 66). He asked Petitioner if he still wished to give a statement to which Petitioner replied that "yes, he would be cooperative in doing that." (*See* Tr. Dec. 20, 1995 trial at p. 67). The statement was taken in the Nitro City Council chambers. (*See* Tr. Dec. 20, 1995 trial at pp.67).

17. Petitioner began giving the statement at 11:13 p.m. that night. (*See* Tr. Dec. 20, 1995 trial at p. 69; *see also* State's Exhibits Six and Twelve). Petitioner handwrote the statement about the events that transpired at Danny's Rib House. (*See* Tr. Dec. 20, 1995 trial at pp.72-73; *see also* State's Exhibits Six and Twelve). Petitioner wanted to write the statement himself because "he didn't want to leave anything out." (*See* Tr. Dec. 20, 1995 trial at pp. 73, 93-94).

6

18.     Petitioner took approximately 30 to 35 minutes to handwrite his own statement. (*See* Tr. Dec. 20, 1995 trial at pp. 73, 80-81). In this statement, Petitioner admitted to reaching into his pocket and "retrieving my locked-blade knife that I use for skinning rabbits and squirrels during hunting season." He further admitted to using that knife to stab Todd Farley with on February 12, 1993. However, Petitioner attempted to justify his actions by blaming the victim for horseplaying with Petitioner by flicking him with the towel. Specifically, Petitioner characterized the victim's playing as an "act of aggression." However, Petitioner's characterization as such was in complete contrast to the observations of Pamela Wilson and James Gibson regarding the victim's mood and behavior on that fateful night. (*See* Tr. Dec. 20, 1995 trial at pp. 76-78; *see also* State's Exhibit 12).

19.     After the handwritten statement, Officer Chatterton engaged Petitioner in a question and answer session that provided as follows:

Q.     Did you feel the physical assaults could go farther?

A.     Absolutely. I thought he may have hit me after that.

Q.     How did you respond?

A.     I reached in my pocket and got my locked-blade knife.

Q.     What did you do with the knife?

A.     I walked close to him. It was not very far because he was just on the other side of the bus cart, and I swung my right hand and arm toward his chest area.

Q.     What did he do?

A.     He backed up about four to six feet and slowly sunk to the floor.

Q.     Did your knife strike him?

A.     I would say definitely so. I don't know where, but somewhere

7

in the chest area.

(*See* Tr. Dec. 20, 1995 trial at pp.87-88, *see also* State's Exhibits 7 and 13).

20. After the question and answer session, Officer Chatteron noticed the bandage on Petitioner's arm. He decided to ask Petitioner additional questions about the wound on his arm. (*See* Tr. Dec. 20, 1995 trial at p. 89). Petitioner responded that "[i]t must have been inflicted when my knife went off Mr. Farley, and it must have hit me in the muscle." (*See* Tr. Dec. 20, 1995 trial at p. 89-90; *see also* State's Exhibits 7 and 13). According to Officer Chatterton, Petitioner remained "very calm and in control." throughout their interaction. (*See* Tr. Dec. 20, 1995 trial at pp. 81, 91-92).

21. Out of an abundance of caution, Detective Jordan decided to transport Petitioner to the hospital to have his wound examined. (*See* Tr. Dec. 18-19, 1995 trial at p. 190). While they were on their way to the hospital, Detective Jordan informed Petitioner that the victim had died. (*See* Tr. Dec. 18-19, 1995 trial at p. 190). In response, Petitioner said "he hated that." Then, after about 15-20 seconds had passed, Petitioner asked the officers if they "thought it was going to snow." (*See* Tr. Dec. 18-19, 1995 trial at p. 196).

22. Petitioner was charged with first-degree murder in the stabbing death of the victim, Stephen Todd Farley ("victim" or "the victim") on or around February 12, 1993. He was subsequently indicted by a Kanawha County Grand Jury in August of 1993 for one count of first-degree murder in Kanawha County Circuit Court Case Number 93-F-105.

23. On or around January 13, 1994, Petitioner was convicted of first-degree murder by a Kanawha County petit jury. The jury recommended that the Petitioner be sentenced to life in prison with a recommendation of mercy. The trial court sentenced Petitioner according to the

8

P10

jury's recommendation. During that trial, Petitioner was represented by attorneys Stephen Warner and Michael Cline.

24. On or around August 26, 1994, Petitioner filed a Petition for Appeal with the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court"). His petition raised several grounds for relief including objections to the jury instructions, prosecutorial misconduct, and insufficient evidence to sustain a first degree murder conviction. On appeal, Petitioner was represented by Warner, one of the attorneys who had represented Petitioner at trial.

25. On July 19, 1995, the West Virginia Supreme Court issued its opinion which reversed Petitioner's conviction and remanded the case for a new trial. *See State v. Guthrie,* 194 W.Va. 657 (1995). The reversal was based upon the prosecutor's comments to the jury regarding the penalties for second degree murder and voluntary manslaughter and the prosecutor's line of questioning to a defense witness regarding the Petitioner's views on women, African Americans, and the Ku Klux Klan. *Guthrie* also clarified the definition of premeditation and while the Court declined to impose its holding retroactively, found that the Petitioner should get the benefit of its ruling upon remand. *Id.* at 677.

26. On December 18, 1995, Petitioner was re-tried for the first degree murder of Stephen Todd Farley. He was again represented by Mr. Warner and Mr. Cline. Similar to his defense in the original trial, Petitioner argued that he was, at most, guilty of voluntary manslaughter. The defense's theory was that Petitioner suffered from numerous mental conditions that caused him to suffer a panic attack on the night the victim, Todd Farley, was stabbed and that he "snapped" when the victim flicked him in the nose with the towel.

9

27. In support of Petitioner's defense, Dr. Sidney Lerfald, a psychiatrist, testified that Petitioner suffered from a myriad of psychological conditions including panic disorder with agoraphobia, chronic depression, body dysmorphic disorder, and borderline personality disorder. (*See* Tr. Dec. 20, 1995 trial at pp. 6-41). Dr. Lerfald testified that none of the disorders suffered by Petitioner are "ordinarily associated with criminal behavior." (*See* Tr. Dec. 20, 1995 trial at p. 20). Dr. Lerfald further testified that panic attacks are not generally associated with criminal conduct but instead a panic attack would normally cause a person to "prefer to get away." (*See* Tr. Dec. 20, 1995 at p. 35).

28. Importantly, as to whether Petitioner could have conformed his conduct to the letter of the law, Dr. Lerfald testified, "[i]n my opinion, he [Petitioner] could have left. He had the choice of whether to leave or not leave. He didn't leave. . ." (*See* Tr. Dec. 20, 1995 at pp. 23-24). Upon cross-examination, Dr. Lerfald further conceded that none of the symptoms Petitioner exhibited would have prevented him from premeditating, deliberating, or acting in a willful and intentional manner. (*See* Tr. Dec. 20, 1995 at pp. 33-34).

29. In rebuttal, the State called Psychiatrist Dr. Ralph Smith to testify as to his opinion regarding Petitioner's mental conditions. Dr. Smith testified that Petitioner suffered from a panic disorder, an adjustment disorder with mixed emotional features, body dysmorphic disorder, and a personality disorder not otherwise specified with avoidant, paranoid, and anti-social features. (*See* Tr. Dec. 21, 1995 at p. 8). According to Dr. Smith, none of those diagnoses "would reach the threshold of making a mental disease or defect which would have interfered with [Petitioner's] capacity to appreciate the wrongfulness of his conduct or which would have prevented him from conforming his conduct to the requirements of the law." (*See*

10

Tr. Dec. 21, 1995 at p. 12). Dr. Smith also opined that Petitioner had the capacity to premeditate, deliberate, and form an intent to do an evil act. (*See* Tr. Dec. 21, 1995 at p. 12).

30.    Dr. Smith extensively detailed panic attacks for the jury and specifically as it pertained to the case at hand. Specifically, he explained:

Q.    Doctor, there has been evidence in this case that there was some horseplay going on at the restaurant on the night in question, and one of the individuals, the decedent in this case, hit Mr. Guthrie or tapped Mr. Guthrie—the jury will decide what it was—with a towel. As a consequence, Mr. Guthrie removed a knife from his pocket and stabbed that individual in the throat and killed him. Based upon your examination and your knowledge as a forensic psychiatrist, is that a behavior pattern one would expect from one having a panic attack?

A.    The behaviors you just described are not the type of behaviors one sees with a panic attack. . . . A panic attack consists of subjective symptoms. It has to do with anxiety, and a feeling dread; your heart races and pounds, you get dizzy, a smothering sensation, a tingling in your fingers. This can go on for several minutes. It usually resolves itself. None of the symptoms listed for this disorder consist of a violent action; in fact, no action is part of the symptom.

Q.    Doctor, given the same factual patterns, assuming even that Mr. Guthrie was in the throws of a panic attack, would that pattern of behavior be what you expect?

A.    No.

Q.    Doctor, I have given you a copy of Mr. Guthrie's statement to Mike Chatterton, of the Nitro Police Department. Have you had occasion to review that, sir?

A.    Yes. . . .

Q.    Doctor, in your opinion as a forensic psychiatrist, what is the medical significance of the language used in that statement?

A.    Well, the statement describes the defendant's thoughts and feelings at the time of this alleged crime, and there are several times in his description where he felt put upon, upset, and used

11

phrases such as 'Letting it pass,' 'Again, I did nothing, I let it pass,' 'I gave him none,' when the person wanted a confrontation in his mind.

There are actually five times when it appears that he felt provoked and did nothing. So, in my mind this tells me, during that period of time, he was able to make choices. He could weigh alternatives and reason out what would be best for him to do under the circumstance. Finally, then, his act of aggression which he felt he had no alternative or no recourse. But there were many times when he did feel he had alternatives. So he took the choice then. I don't think it was driven by any mental disease or defect at that time to take this action.

Q. Would it be fair to say, Doctor, that you could say that was a mind deliberating?

A. That would be one way of looking at it, yes.

Q. And a mind, Doctor, meditating?

A. That could be seen that way, yes.

(*See* Tr. Dec. 21, 1995 at pp. 13-17).

31. On December 22, 1995, a Kanawha County petit jury again found Petitioner guilty of first-degree murder and recommended that he be sentenced to life in prison with a recommendation of mercy. This Court sentenced the Defendant according to that verdict by order dated April 2, 1996.

32. In October of 1996, Petitioner again appealed his conviction to the West Virginia Supreme Court and was represented by Stephen Warner. In that Petition for Appeal, he raised the following assignments of error:

a. The trial court erred in instructing the jury, over Petitioner's objection, that gross provocation is an element of voluntary manslaughter;

b. The trial court erred in instructing the jury, over Petitioner's objection, that gross provocation necessary for voluntary manslaughter is objective, not subjective; and

12

P14

c. The trial court erred in refusing to give instructions taken verbatim from non-syllabus points of *State v. Guthrie* which gave examples and factors for the jury to consider in determining whether this is a first-degree murder case.

33. In January 1997, the State Supreme Court refused the Petition.

34. On November 15, 2007, Petitioner *pro se* filed a Petition for Writ of Habeas Corpus. Petitioner raised the following grounds for relief:

a. He was denied effective assistance of trial counsel when the evidence showed that there was no intent on his part to commit homicide;

(i) Effective assistance of counsel requires the attorney to address the critical issues of the case; and

(ii) Counsel's failure to take proper motions to address the issue against first degree murder where there was no evidence to support first degree murder is abandonment of the client and is ineffective assistance of counsel;

b. His constitutional rights were violated when he was not promptly taken before the county magistrate; and

c. He was denied due process of law as there was a clear case of insufficiency of evidence to support a verdict of first degree murder.

(*See* Petitioner's Petition for Writ of Habeas Corpus filed November 15, 2007 attached to Respondent's Response as Exhibit A).

35. By order dated September 11, 2008, this Court denied the Petition for Writ of Habeas Corpus and dismissed the civil action. In its Order, this Court made detailed findings of fact and conclusions of law. (*See* Order Denying Petitioner's Petition for Writ of Habeas Corpus attached to Respondent's Response as Exhibit B).

36. On May 28, 2013, Petitioner filed the instant Petition for Writ of Habeas Corpus alleging the following grounds:

a. Ineffective assistance of counsel based upon the following:

13

(i)     Trial counsel failed to raise the issue of prompt presentment;

(ii)    Trial counsel failed to move to exclude testimony regarding the victim's father's occupation; and

(iii)   Trial counsel failed to appeal the State's introduction of Petitioner's question to the officers as to whether they thought it was going to snow after he had learned that the victim had died.

b.      This Court denied the Petitioner a fair trial by giving instructions that emphasized gross provocation for a voluntary manslaughter verdict and minimized the element of malice for a second-degree murder verdict which misled the jury and seriously hindered Petitioner's defense.

c.      The cumulative effect of defense counsel's errors and this Court's errors denied the Petitioner a fair trial in violation of the constitutions of the United States and West Virginia.

## II.     CONCLUSIONS OF LAW

37.     This Court finds that West Virginia's post-conviction habeas corpus statute "clearly contemplates that [a] person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding." Syl. Pt. 1, *Markley v. Coleman*, 215 W.Va. 729 (2004) (citations omitted). Such proceeding gives the Petitioner an opportunity to "raise any collateral issues which have not previously been fully and fairly litigated." *Id.* at 732. The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters known or which, with reasonable diligence, could have been known. *Id.* at Syl. Pt. 2.

14

P16

38. A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Id.* at 733. It may deny the petition without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the Petitioner is not entitled to relief. *Id.* at Syl. Pt. 3. A circuit court may also find that the habeas corpus allegation has been previously waived or adjudicated and if so, the court "shall by order entered of record refuse to grant a writ and such refusal shall constitute a final judgment." *Id.* at 733 (citing W.Va. Code section 53-4A-3(a)).

39. When determining whether to grant or deny relief, a circuit court is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. *Id.* at Syl. Pt. 4. *See also* W.Va. Code Section 53-4A-3(a).

40. This Court finds that Petitioner raised the issue of ineffective assistance of counsel, prompt presentment, and insufficient evidence in his previously filed petition. This Court found, by detailed Order, that such claims for relief were without merit. (*See* Exhibit B). This Court further finds that Petitioner has made no new claims that would entitle him to relief in the instant petition.

41. In West Virginia, ineffective assistance of counsel claims are to be governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Miller*, 194 W.Va. 3 (1995); *State ex rel. Quinone v. Rubenstein*, 218 W.Va. 388 (2005); *State v. Frye*, 221 W.Va. 154 (2006). First, a court must determine if counsel's performance was deficient under an objective standard of reasonableness. Second, a court must determine if there

15

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Miller*, 194 W.Va. at 16.

42. The West Virginia Supreme Court has long held that:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second guessing of trial counsel's strategic decisions. Thus a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

43. Petitioner argues that his counsel performed unreasonably for failing to address the issue of prompt presentment, failing to object to testimony regarding the fact that the victim's father was a deputy sheriff, and failing to appeal the trial court's admission of the Petitioner's question to the officers as to whether they thought it was going to snow after he was informed that the victim had died.

44. The victim's father, Stephen Farley, did testify at Petitioner's trial—the transcript of which has been attached to Petitioner's instant petition. In its entirety, Mr. Farley's elicited testimony during the December 1995 trial was as follows:

Q. Mr. Farley, would you introduce yourself to this jury, please?

A. My name is Stephen Farley

Q. Where do you work, sir?

A. I'm a deputy sheriff in Putnam County.

Q. Sir, who was Stephen Todd Farley?

A. Stephen Todd Farley was my son.

Q. Mr. Farley, I'm showing you what has previously been marked as State's Exhibit No. 9. Who is that, sir?

16

A. That is my son.

Q. That's all I have for this witness.

44. This Court finds that testimony and exhibits are admissible to establish the identity of a victim—one of the essential elements the State was required to prove at trial. In *State v. McKenzie*, 197 W.Va. 429, 448, the West Virginia Supreme Court found it perfectly proper to admit not only a photograph of the victim before her murder but also a photograph of the victim's child she shared with the Defendant. In *State v. Wheeler*, 187 W.Va. 379 (1992), the Supreme Court held that a widow was permitted to testify solely for the purposes of identifying the victim—particularly given that the prosecution did not attempt to use the widow to tug at the heartstrings of the jury. *Id.* at 389.

45. This Court finds that similar to *Wheeler*, Stephen Farley was called to testify as to the identity of the victim. His testimony was limited to that topic. Petitioner's argument in this instant petition is that his counsels' failure to object to such testimony constituted ineffective assistance of counsel. This Court finds that Petitioner's failure to object is not deficient under an objective standard of reasonableness. Therefore, Petitioner's argument fails under the first prong of *Miller*. However, even assuming such failure was deficient, the Court finds that it cannot be credibly argued that the admission of the victim's father's occupation as a deputy sheriff was such inflammatory and prejudicial testimony that its exclusion would have resulted in a different verdict. There was ample evidence of Petitioner's guilt presented to the jury. Therefore, Petitioner's argument on this issue must fail.

46. Similarly, this Court finds Petitioner's argument that his counsel was ineffective for failing to appeal the admission of Petitioner's query to Nitro police officers as to whether they thought it would was going to snow upon learning that the victim had died, must also fail.

17

47.    By Petitioner's own argument in his Petition, his trial counsel—who also served as his appellate counsel in both of his appeals—objected strenuously to the admission of Petitioner's query. (*See* Petitioner's Petition for Writ of Habeas Corpus at ¶67). However, he argues that no reasonably competent attorney would have failed to appeal that line of questioning.

48.    The analysis begins with the question as to whether the counsel's failure to appeal was so "outside the broad range of professionally competent assistance" that it constituted ineffective assistance of counsel. *See* Miller, 194 W.Va. at Syl. Pt. 6. It should be assumed that an attorney's performance was reasonable and adequate, and Petitioner must rebut that presumption. *Id.* The Petitioner must also show that the result of the proceedings would have been different had counsel raised this issue on appeal. *Id.*

49.    This Court finds that Petitioner cannot meet the heavy burden imposed on him in establishing ineffective assistance of counsel. The fact that Attorney Warner, who had represented Petitioner in both trials and both appeals, chose not to appeal the trial court's allowance of this particular line of questioning does not constitute ineffective assistance of counsel. Petitioner simply fails to establish that this decision was so outside the range of professionally competence assistance that it renders counsel's performance ineffective. Furthermore, Petitioner cannot establish that the result would have been different. Petitioner must show that had his counsel appealed this line of questioning to the West Virginia Supreme Court, the Court would have reversed his conviction. Petitioner relies heavily on the Supreme Court's opinion in *State v. Guthrie*, 194 W.Va. 657. In the first appeal, the Court discussed the admission of this line of questioning. *Id.* at 686-687. However, important to the Court was the fact that the State had not disclosed the statement until cross-examination and that such non-

18

P20

disclosure was prejudicial. *Id.* Attorneys Warner and Cline had represented the Petitioner in both of his trials. Therefore, there can be no credible argument that Petitioner's counsel were surprised or prejudiced by this line of questioning during the second trial.

50. In his November 2007 Petition for Habeas Corpus, Petitioner raised the issue of prompt presentment. The Court denied relief on this ground, as well as all other grounds raised by Petitioner at that time. Now Petitioner re-raises the issue under the guise of an ineffective assistance of counsel claim. However, since this Court has already found that the Petitioner's right to a prompt presentment was not violated, this Court finds that there can be no valid claim that Petitioner's trial counsel was deficient in failing to raise the issue at trial.

51. West Virginia Code Section 62-1-5(a)(1) (1931) provides that "[a]n officer making an arrest. . . shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made." Likewise, Rule 5(a) of the West Virginia Rules of Criminal Procedure states that "[a]n officer making an arrest . . . shall take the arrested person without unnecessary delay before a magistrate where the arrest is made."

52. West Virginia's prompt presentment rule is triggered when an accused is placed under arrest or once a defendant is in police custody and there is sufficient probable cause to warrant an arrest. Syl. Pt. 4, *State v. Rogers*, 744 S.E.2d 315 (2013).

53. The delay in taking a defendant to a magistrate may be a critical factor in the totality of the circumstances making a confession involuntary and hence inadmissible where the primary purpose of the delay was to obtain a confession. *Id.* at Syl. Pt. 5; *see also, State v. Gray*, 217 W.Va. 591 (2005).

54. The Supreme Court has also held that "[w]hen a statement is obtained from an accused in violation of the prompt presentment rule, neither the statement nor matters learned

19

directly from that statement may be introduced against the accused at trial." Syl. Pt. 1, *State v. DeWeese*, 213 W.Va. 339 (2003). Importantly, in footnote ten of that opinion, the Court explains that "[w]e wish to make clear that our prior cases do permit delay in bringing a suspect before a magistrate *when the suspect wishes to make a statement. Id.* (emphasis added).

55.     Regarding prompt presentment, the Supreme Court has recognized that "[c]ertain delays such as delays in the transportation of the defendant to the police station, completion of booking and administrative procedures, recordation and transcription of a statement, and transportation of a defendant to a magistrate do not offend the prompt presentment requirement." *Rogers*, 744 S.E.2d at 320 (internal citations omitted). Additionally, the delay caused by reducing an oral confession to writing "ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved." *Id.* at 321 (internal citations omitted).

56.     This Court has previously determined that Petitioner's right to prompt presentment was not violated. Any delay in taking Petitioner before a magistrate was reasonable for the following reasons:

(a)     Petitioner was initially transported to the police station pursuant to his warrantless arrest for the administrative purposes of recording his general information, fingerprinting Petitioner, photographing Petitioner, and preparing the necessary charging documents.

(b)     Officers asked Petitioner if he would like to give a statement regarding the night's events. After being read his *Miranda* rights, Petitioner voluntarily provided a statement to police. He was not threatened or coerced into giving a statement.

20

P22

In fact, Petitioner requested that he be allowed to write out his own statement so that he did not leave anything out. This took approximately 30 to 35 minutes to complete. Afterwards, Officer Chatterton engaged Petitioner in a question and answer session that lasted approximately 25 to 30 minutes. Therefore, Petitioner's total time spent giving a statement was about one hour.

(c) Any further delay of Petitioner's presentment to a magistrate was due to Petitioner injuring himself during his attack on the victim. The police first had paramedics respond to the police station to treat the wound on Petitioner's left arm. Then, after Petitioner had given his statement, the officers transported him to a hospital to have the wound further evaluated. Then Petitioner was transported to a magistrate and arraigned.

57. This Court finds that the facts show there was no unreasonable delay in presenting the Petitioner before a magistrate for his arraignment. Petitioner voluntarily provided the police a statement. He even requested to take the time to write out his own statement. Any additional delay was a result of the police attending to the medical needs of the Petitioner—for a wound that Petitioner inflicted upon himself during his attack on the victim. There is nothing establishing that any delay in being taken before a magistrate was unreasonable. Therefore, Petitioner's assertion that his counsel was defective in failing to raise the issue of prompt presentment at trial must fail.

21

58. This Court further finds that Petitioner's next argument—that the trial court denied him a fair trial by giving jury instructions that emphasized gross provocation instead of a lack of malice regarding the offense of voluntary manslaughter—is without merit.

59. Petitioner admits that gross provocation did not exist to justify him stabbing Todd Farley in the neck and ending his life on that fateful night. (*See* Petitioner's Petition at ¶ 70). However, Petitioner argues that he should not have been found guilty of either first or second degree murder because he did not possess malice when he stabbed the victim.

60. Petitioner likewise admits that this Court instructed the jury on the element of malice, its definitions, and that malice is a prerequisite for murder. (*See* Petitioner's Petition at ¶ 77). Petitioner complains of the Court's emphasis on gross provocation in the jury instructions for voluntary manslaughter. However, the West Virginia Supreme Court "has consistently defined voluntary manslaughter as a sudden, intentional killing upon gross provocation and in the heat of passion." *State v. Beegle*, 188 W.Va. 681, 685. (1992). Therefore, the Court finds that Petitioner's argument regarding the jury instructions lacks merit and his request for relief predicated on this argument must fail.

61. Lastly, Petitioner argues that the cumulative effect of his counsels' errors and this Court's errors denied him a fair trial. "Cumulative error can be found "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of the errors standing alone would be harmless error." Syl. Pt. 5, *State v. Smith*, 156 W.Va. 385 (1972).

62. This Court finds that Petitioner's assertion regarding cumulative error is only a blanket assertion. In Syllabus Seven of *State ex rel. Hatcher v. McBride*, 221 W.Va. 760, the

22

Court explained, "[a]n appellant must carry the burden of showing error in the judgment of which he complains. The Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of correctness of the judgment." Because there are no factual assertions or legal arguments to support it, the Court finds that Petitioner's claim of cumulative error also fails to establish that he is entitled to relief.

### III. RESOLUTION

Based upon the foregoing, the Court hereby **DENIES** Habeas Corpus Petition 13-P-290 and **ORDERS** the matter stricken from the docket of the Court. The Court notes the Petitioner's objections and exceptions to its ruling. The Court further **ORDERS** certified copies of this Order be provided to all counsel of record and the Petitioner.

**ENTER THIS** 8th **day of** Nov _____, 2013

_____
The Honorable Paul Zakaib, Jr., Judge
Thirteenth Judicial Circuit

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS ___15___
DAY OF ___November 2013___
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

23